2001 OK CIV APP 14

**Cathy COWAN (now Fisher), Plaintiff/Appellant/Cross–Appellee,**

v.

**Stanley Ray COWAN, Defendant/Appellee/Cross–Appellant.**

**No. 93446.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Aug. 25, 2000.

Rehearing Denied Sept. 22, 2000.

Certiorari Denied Jan. 23, 2001.

Joel L. Kruger, Peter G. Pariseau, Kruger & Associates, P.C., Tulsa, OK, for Plaintiff/Appellant/ Cross–Appellee.

Richard T. Garren, Karen E. Langdon, Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, OK, for Defendant/Appellee/Cross–Appellant.

## MEMORANDUM OPINION

BUETTNER, J.

¶ 1 Plaintiff/Appellant/Cross–Appellee Cathy Cowan (now Fisher) (Mother), appeals from an order of the trial court which awarded an amount of child support arrearage, but which also determined that laches barred recovery of nine years' worth of arrearages. Defendant/Appellee/Cross–Appellant Stanley Cowan (Father), appeals from the trial court's decisions holding him in contempt for failure to pay four months of child support from October 1984 to January 1985, and denying Father's application to hold Mother in contempt for failing to comply with the visitation ordered in the decree. Mother asserts that the equitable defense of laches is not available to bar recovery of unpaid child support. We agree and reverse and remand for a new determination of the arrearages owed to Mother. Father asserts that the statute of limitations for contempt proceedings is three years and that the trial court was therefore barred from finding him in contempt for failure to pay child support more than three years before Mother filed her application. We reverse the trial court's decision on Mother's contempt application because we find that dormancy bars collection of child support which accrued in 1984 and 1985. We affirm the trial court's denial of Father's contempt application.

¶ 2 Mother and Father were married in 1981. Two children were born of the marriage. The divorce decree was entered September 5, 1984 and filed January 27, 1986. Pursuant to the decree, custody of the children was awarded to Mother. Father was granted visitation in Texas [1] the last weekend of each month, as well as one month during the summer. Each party was ordered to disclose to the other party the children's whereabouts on June 15 and July 15 of each year .[2] A holiday visitation schedule was also included in the decree. The decree further ordered Father to pay $200 per month as child support, commencing on October 1, 1984, and continuing until the children reach majority.

¶ 3 The testimony revealed that Father never paid child support or exercised visitation from the time the decree was entered until Mother contacted him in September 1995. Father testified that he failed to pay child support in part because Mother's family told him the parties' children were dead. Father made little effort to determine the truth of this allegation. Mother conceded that she failed to inform Father of the children's whereabouts as required by the decree, but she asserted that her mother's address in Tulsa remained the same and that Father could have contacted her through her mother. Father testified that Mother's mother would not give him information regarding Mother or the children. Mother testified that she lived in Texas for two years after the decree was entered and then returned to Tulsa. Mother testified that she had used at least three different last names since the entry of the decree. While she was living in Tulsa, Mother occasionally sought to find Father, but was unsuccessful until she located him in Sallisaw in 1995. At the time of trial in February 1999, Father had paid all child support due from August 1994 through January 1999, without interest, however.

¶ 4 Mother filed her application for contempt August 6, 1997. Mother alleged Father owed $62,530 in unpaid child support and interest.[3] Father filed his answer and counterclaim for contempt September 25, 1997. Father alleged Mother was in contempt for denying Father's visitation rights from the time of the decree through September 1995.

¶ 5 Trial on these issues was held January 6, 1999. In its order, the trial court held 1) Mother never attempted to notify Father of the whereabouts of the children as required by the decree; 2) Mother failed to make any effort to collect child support; 3) Father made no child support payments immediately

---

1. Apparently Mother planned to move to Texas at the time the decree was entered. Mother in fact moved to Texas in early 1985.

2. Those dates were the beginning and ending dates for Father's summer visitation.

3. Mother later amended this amount to $62,344.38.

following the decree; 4) Father should have made child support payments until January 1985 (which amounted to $900); 5) Father acknowledged his obligation to pay child support from August 1994 until August 1995 and Mother is to have judgment for the statutory arrears (interest) from August 1994 through August 1995 up to the time of payment in June 1998; 6) Father is further ordered to pay interest on other specific late payments made during 1996 and 1997; 7) Mother's claim for child support from January 1985 through August 1994 is barred by laches and Father therefore has no obligation for child support during that period; 8) there was no evidence of a specific denial of visitation and accordingly, the court did not find Mother to be in contempt; and 9) Father was found guilty of contempt for failure to pay child support from September 1984 through January 1985 and was sentenced to 30 days in jail with the purge fee set at $900.

¶ 6 Mother relies on this court's opinion in *Aguero v. Aguero*, 1999 OK CIV APP 38, 976 P.2d 1088, for its holding that equitable defenses such as laches, estoppel, waiver, and release are not available to obligor parents in actions to recover unpaid child support. In *Aguero*, the parties divorced in 1987 and the father never paid the full amount of child support owed each month. In 1997, DHS filed an application for contempt citation in which it alleged arrearages of $44,650. At the hearing, the parties disputed the amount of arrearages owed, but both parties agreed that the father had failed to pay over $20,000. The father alleged that the mother acquiesced in the reduced and sporadic child support payments he made and asked the court for equitable relief and a finding that no back support was owed. The trial court applied the law of waiver and equitable estoppel and awarded Mother an arrearage of $3,150. In determining whether equitable defenses were available to an obligor parent in an action for unpaid child support, this court examined three cases: *McNeal v. Robinson*, 1981 OK 43, 628 P.2d 358; *Kissinger v. Kissinger*, 1984 OK CIV APP 52, 692 P.2d 71; and *Thrash v. Thrash*, 1991 OK 32, 809 P.2d 665.

¶ 7 The *Aguero* court determined that, while those cases appeared to support the use of equitable defenses in child support cases, upon closer inspection, *McNeal* actually only provided for equitable *relief* where an obligor parent has alternatively satisfied his obligation to support his children, in the form of voluntary expenditures for the benefit of the children or assuming physical custody of the children. In fact, *McNeal* never used the phrase "equitable defenses" to excuse nonsupport of an obligor parent's children.

¶ 8 In *Aguero*, this court further determined that in *Kissinger*, this court erroneously extended *McNeal* to allow a finding that the mother waived her right to enforce unpaid child support, a finding that the *Aguero* court termed "expanding *McNeal* far beyond what we perceive as its intended reach."

¶ 9 In *Thrash*, the trial court ordered a large arrearage and on appeal, the father asserted equitable defenses in asserting that the mother waited seven years to enforce the terms of the decree. The Supreme Court found that no set of facts had been presented to support the father's equitable defenses. The court did say that the "father is correct in concluding that equitable defenses may be invoked to bar the recovery of delinquent child support payments." However, in *Aguero*, this court noted that that statement by the Supreme Court came immediately after its discussion of *McNeal*, in which the Supreme Court noted that *McNeal* allowed equitable consideration of the fact that the father in *McNeal* failed to make child support payments only while the children were residing with him. This court in *Aguero* therefore concluded that the *Thrash* court did not intend to extend the full range of equitable defenses to excuse noncompliance with a support order.

¶ 10 In *Aguero*, this court held, in pertinent part:

> We believe the status of Oklahoma jurisprudence in regard to the interposition of "equitable defenses" in a child support collection action is still limited to the facts and holding of *McNeal*: a child support obligor may be given some form of credit against an arrearage for alternative com-

pliance with the support order. Nothing in the subsequent case law convinces us that *McNeal's* equitable recognition of "alternative compliance" has been, or should be, expanded to include the divergent concept of "noncompliance due to laches, estoppel, waiver." . . . . (O)ur conviction that equitable defenses are not available to excuse noncompliance with a support order is clearly supported by public policy. The award of child support is for the benefit of the child. Children are entitled to support from both of their parents, and one parent should not be able to waive a child's right to support from the other. Recognizing the entire gamut of equitable defenses would afford parents too much discretion in complying with court-ordered support. . . .

¶ 11 Although Father argues that he should be excused from payment of child support because the children were secreted from him for several years, there is no evidence that Mother ever told Father that the children were dead. Mother and the children should not be punished for the actions of Mother's mother, who allegedly told Father he would never see the children alive again. Furthermore, Mother and the children returned to Tulsa after only two years in Texas, yet Father made virtually no effort to locate them, despite the fact that Father lived in the Tulsa vicinity until approximately 1994. Mother is the one who eventually made contact with Father at which time Father began paying child support in 1995.

¶ 12 Even if the defense of laches were available, Father had the burden of proving irreparable damage or loss due to his reliance on Mother's inaction and indifference. *Aguero, supra,* citing *Clark v. Unknown Heirs of Osborn,* 1989 OK 145, 782 P.2d 1384, 1386. Father asserts that he suffered the irreparable harm of believing his children were dead and being denied visitation. However, as noted above, there was no evidence that Mother was responsible for Father's belief that the children were dead. Additionally, Father indicated that he may

not have really believed the children were dead. Finally, the trial court in its order found that there had been no specific denial of visitation rights; and, payment of child support may not be conditioned upon affording an opportunity to exercise visitation rights. *Hester v. Hester,* 1983 OK 50, 663 P.2d 727, 728–9("(t)he custodial parent's misconduct cannot destroy the child's right to support, . . .").

¶ 13 For the foregoing reasons, we find that the trial court erred in determining that laches barred recovery of unpaid child support from January 1985 through August 1994. We therefore reverse and remand for determination of the arrearage, with interest, owed by Father. We must consider, however, the period for which Mother is able to collect back child support considering the statute of limitations and dormancy statutes in effect during the period at issue.

¶ 14 The statute of limitations for actions to collect unpaid child support was previously five years under 12 O.S.1981 § 95(6). *Logan v. Logan,* 1994 OK CIV APP 77, 877 P.2d 51, citing *Hough v. Hough,* 206 Okla. 179, 242 P.2d 162 (1952). Effective September 1, 1994, the following provision was added to the limitations statute: "(a)n action to establish paternity and to enforce support obligations can be brought any time before the child reaches the age of eighteen (18)." 12 O.S.Supp.1994 § 95(7). Then, effective November 1, 1996, the following provision was added to the limitations statute: "(c)ourt-ordered child support is owed until it is paid in full and it is not subject to a statute of limitations ." 12 O.S.Supp.1996 § 95(9).[4] However, in *Logan,* this court noted that the enactment of 12 O.S.Supp.1987 § 1291, now 43 O.S.1991 § 137, effectively negated the statute of limitations for child support matters. 877 P.2d at 52. This is because § 137 established that all court-ordered child support payments become judgments on the date they are due. In other words, obligee parents no longer need to file *actions* to enforce child support orders because they

---

4. "(A) legislative change in the statute of limitations applies to existing claims, in the absence of contrary provisions, as of the date those claims first became subject to operation of the changed limitation." *Logan,* 877 P.2d at 52.

are judgments by operation of law on the date each payment becomes due, and therefore a limitations period on such actions is unnecessary. Section 137(C) originally provided that such judgments become dormant if not enforced within five years. However, effective November 1, 1996, § 137(C) was modified to provide that child support orders shall not become dormant for any purpose,[5] and that a judgment for past due child support shall be enforceable until paid in full. Accordingly, judgments for past due child support due on or before November 1, 1991 are dormant and cannot be enforced. Therefore, the order entered by the trial court which ordered Father to pay an arrearage of $900 for child support owed in 1984 is reversed. We remand for entry of an order enforcing the child support judgments which are not dormant.

¶ 15 Father argues that the trial court erred in holding him in indirect contempt for any child support obligation more than three years old. Father argues that the statute of limitations for contempt proceedings is three years. We note that Father has failed to present authority directly supporting this claim. We further note at least one case has determined that the previous five year statute of limitations for collection of child support orders also applies to indirect contempt actions to enforce a child support obligation. See *Hyde v. Hyde*, 1992 OK CIV APP 161, 843 P.2d 393. We have determined above that the child support payments for which the court found Father to be in contempt are dormant, and we therefore reverse the order finding Father in contempt for failure to pay child support from September 1984 to January 1985.

¶ 16 Father next asserts that the trial court erred in failing to hold Mother in indirect contempt of court for failing to comply with the visitation order. Father has failed to present any authority to support this argument. Assertions of error unsupported by authority will not be considered. Supreme Court Rule 1.11(k)(1), 12 O.S.Supp. 1997, Ch. 15, App. Further, the trial court

determined there had been no specific denial of visitation rights. Denial of visitation rights is a proper matter for a finding of indirect contempt. *Burris v. Hunt*, 1998 OK CIV APP 125, 965 P.2d 1003, 1006. However, on review of a denial of an application for contempt, only questions of law may be considered. *Torres v. Torres*, 1998 OK CIV APP 18, 956 P.2d 166, 168. Because no question of law has been presented, we must affirm the denial of Father's application for contempt. Father's last proposition of error has been addressed by our analysis above.

¶ 17 For these reasons, the trial court's order is AFFIRMED IN PART/REVERSED IN PART AND REMANDED for proceedings consistent with this opinion.

¶ 18 JONES, P.J., and GARRETT, J., concur.

5. Except that they shall cease to be a lien upon real property five years from the date they are

filed of record with the county clerk.